UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

JACK JERVIS,                          )
                                      )
        Plaintiff                     )
                                      )
        v.                            )        CAUSE NO. 3:05-CV-602 RM
                                      )
DR. MICHAEL MITCHEFF,                 )
                                      )
        Defendant                     )

OPINION AND ORDER

Jack Jervis, a <u>pro se</u> prisoner, brings an Eighth Amendment claim under 42 U.S.C. § 1983 based upon the alleged denial of adequate medical care for injuries and resultant pain in his left knee and back that he sustained in a fall down a flight of stairs.

Mr. Jervis filed this case on September 21, 2005, against three defendants. After screening the original complaint, the court allowed him to proceed against a single defendant, Dr. Michael Mitcheff. Mr. Jervis later submitted an amended complaint that the court dismissed entirely because it didn't state a claim of deliberate indifference. The court of appeals disagreed with this court's view that the complaint set forth "multiple, discrete" acts. The court of appeals held that under the "continuing violation" doctrine, the complaint could be read to state a claim for deliberate indifference. <u>Jervis v. Mitcheff</u>, 2007 WL 4355433 (7th Cir. Dec.13, 2007). In so doing, the court of appeals accepted as true, as courts must at the pleading stage, Mr. Jervis's claims that Dr. Mitcheff examined him once in a 24-month period in which he complained repeatedly about pain in his back and

knee. Mr. Jervis also alleged that Dr. Micheff's refusal to investigate and diagnose the source of his pain, insistence there was "nothing wrong," and denial of his requests to see an orthopedic specialist, "blinded" the doctor to his injuries. If proven, the court of appeals said, Mr. Jervis's allegations could support a conclusion that the case involved more than a mere disagreement over the course of treatment.

The case is before the court on Dr. Mitcheff's summary judgment motion, on which the court of appeals' ruling has no effect. <u>Muzikowski v. Paramount Pictures Corp</u>, 477 F.3d 899, 905 (7th Cir. 2008). Dr. Mitcheff asserts he is entitled to judgment because Mr. Jervis "received and continues to receive proper medical care"; Dr. Mitcheff denies that he ever intended to harm Mr. Jervis. Dr. Mitcheff also contends he is entitled to qualified immunity.

In pertinent part, Mr. Jervis's amended complaint states:

> This is a civil rights action . . . alleging deliberate indifference and denial of proper medical care by the defendant in violation of the Eighth and Fourteenth Amendments . . . when the defendant deliberately delayed and denied access to medical specialists and to corrective surgery for back and knee injuries sustained when Jervis was pushed down a flight of stairs on August 2, 2003, at Indiana State Prison and landed on his back with his left leg bent under him.

Mr. Jervis filed his own affidavit in opposition to Dr. Mitcheff's summary judgment motion. Dr. Mitcheff argues correctly that Mr. Jervis's affidavit contains inadmissible hearsay to the extent it repeats what other doctors told Mr. Jervis, and that it contains inadmissible speculation to the extent Mr. Jervis offers medical opinion about his own condition and its cause. Dr. Mitcheff's objections

require the court to review Mr. Jervis's affidavit and identify what portions are properly before the court.

Mr. Jervis's affidavit begins with what he said in his amended complaint: "On August 2, 2003, Plaintiff was pushed backwards down a flight of stairs by another inmate at Indiana State Prison and landed on the bottom cement floor on his back with his left leg pinned under him."

The second paragraph of Mr. Jervis's affidavit contains admissible information and inadmissible information. He says, "As a result of the fall, the left leg was severely injured. In fact, the left leg was broken at the knee, in that any pressure on the left leg caused the knee joint to disengage and separate, resulting in severe debilitating pain. Since the left leg could not be used for its normal function of walking, the left leg was essentially broken." Mr. Jervis has personal knowledge that his leg was injured, that any pressure on the left leg caused severe debilitating pain, and that he couldn't use his left leg for walking immediately after his fall. That evidence is admissible. Without medical expertise or an ability to see through his skin, though, he can't testify that his leg was broken at the knee, or that pressure on the leg caused his left knee joint to disengage and separate. *See* FED. R. EVID. 701 (non-expert opinion must be rationally based on personal perception); <u>Stagman v. Ryan</u>, 176 F.3d 986, 996 (7th Cir. 1999) ("Stagman has not demonstrated that Morgan had personal knowledge of the facts asserted in his statement. Thus, Morgan's statement does not meet the first requirement of Rule 701. It is mere speculation and, as such, a meaningless assertion").

The third paragraph, too, contains both admissible and inadmissible evidence: "As a result of the fall, Plaintiff suffered injury to a disc in his upper back, which was a new injury resulting from the fall. Plaintiff has continually complained about the pinched sciatic nerve in his upper back as a result of the fall." That he complained continually about his back, even that he said in his complaints that he had a pinched sciatic nerve in his upper back, are within his personal knowledge. But without medical expertise or an ability to see through his skin, he can't testify that the fall caused a pinched sciatic nerve in his upper back or that it caused a disc injury, or that it was a new injury.

The fourth paragraph of the affidavit contains the linchpin of Mr. Jervis's case: "Plaintiff was not professionally examined by any doctor after he suffered a broken leg and injured his back during the period of August 2, 2003 (when Plaintiff fell down the stairs) and August 3, 2005 (when Plaintiff filed his Civil Rights Complaint)." The fifth paragraph of Mr. Jervis's affidavit contains only admissible information — "On August 2, 2003, a former prison doctor, Doctor Alli, provided Plaintiff with a wheelchair as the fall also reinjured Plaintiffs back which had been surgically corrected at St. Anthony's Hospital, Michigan City, Indiana in 1999."

The first sentence of the sixth paragraph ("Doctor Mitcheff created an abusive doctor-patient relationship by his attitude and by his response to Plaintiffs injuries.") is entirely conclusory, and inadmissible as such, *see, e.g.*, e360 Insight v. The Spamhaus Project, 500 F.3d 594, 603 (7th Cir. 2007) but the

second sentence is within Mr. Jervis's personal knowledge: "On September 2, 2003, when Doctor Mitcheff interviewed Plaintiff for the first time regarding his injuries, Mitcheff informed Plaintiff: 'Get up out of that wheelchair. There is nothing wrong with you. You are a drug addict, and I am not giving you any drugs.'" So, too, is the seventh paragraph of Mr. Jervis's affidavit admissible as based on his personal knowledge: "Then Doctor Mitcheff accused Plaintiff of lying about his previous back surgery in 1999 at St. Anthony's Hospital in Michigan City, Indiana, and continued to assert that Plaintiff was faking his injuries." As will be seen, Dr. Mitcheff denies making those statements, but since a summary judgment court decides whether there should be a trial rather than what the facts are, the court accepts as true (for summary judgment purposes) that Mr. Jervis is quoting Dr. Mitcheff accurately.

The eighth paragraph is based partly on personal knowledge and partly on speculation. Mr. Jervis has personal knowledge that Dr. Mitcheff provided no pain medication, jerked and twisted his left knee, inserted a needle into Mr. Jervis's left knee and pulled out fluid from the left knee. The affidavit is competent proof of those facts under FED. R. CIV. P. 56(e)(1). That the needle appeared to be an 18 gauge horse needle is based on personal observation and helpful, and so is admissible under FED. R. EVID. 701. Whether the knee was broken, or whether what was siphoned from the knee was cartilage and "excess" fluid is speculation when offered by the non-expert Mr. Jervis. *See generally* Collins v. Kibort, 143 F.3d 331, 337 (7th Cir. 1998).

The ninth paragraph of Mr. Jervis's affidavit is entirely based on personal knowledge, and so is entirely admissible for summary judgment purposes: "9. When Plaintiff reacted to the excruciating pain, Doctor Mitcheff declared that Plaintiff was too angry to be examined and then said the following: "You need surgery but you will never get It as long as I am in charge. I will show you what prison is like.""

The shocking tenth paragraph of Mr. Jervis's affidavit also appears to be based on personal knowledge: "Doctor Mitcheff then had Plaintiff placed in the hospital segregation ward for six months during which time Plaintiff was denied any pain medication and any medical treatment for his injuries."

Paragraph 11 of Mr. Jervis's affidavit contains admissible personal knowledge, speculation, and inadmissible hearsay: "After Doctor Mitcheff became the Medical Director for Correctional Medical Services (hereafter CMS) in 2006, the new prison doctor, Doctor Gerald Myers, examined Plaintiff's knee. When the knee came out of the socket, Doctor Myers stated: 'I cannot believe that Doctor Mitcheff did not send you to an orthopedic surgeon. You have the equivalent of a broken leg that has not been diagnosed or corrected since 2003.'" Mr. Jervis has personal knowledge that Dr. Myers examined his knee in 2006, and that he experienced a feeling as though his knee came out of the socket. Whether it actually came out of the socket is a medical opinion that Mr. Jervis isn't competent to offer. Hearsay, though, is an out of court statement offered in court to prove the truth of what the speaker said. *See* FED. R. EVID. 801(c). Hearsay is not admissible at trial or at

summary judgment unless a hearsay exception applies. <u>Gunville v. Walker</u>, 2009 WL 3232433, at *3 (7th Cir. Oct. 9, 2009) ("A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment."). The statement attributed to Dr. Myers is meaningless unless it's offered to prove that Dr. Myers thought Dr. Mitcheff should have sent Mr. Jervis to an orthopedic surgeon and that Mr. Jervis has had the equivalent of an undiagnosed and uncorrected broken leg since 2003. Accordingly, what Dr. Myers said is inadmissible hearsay. *See* FED. R. EVID. 802.

The same is true of the twelfth paragraph of Mr. Jervis's affidavit: "During 2007, Doctor Hassan Akinbiyi worked at Indiana State Prison for a few weeks during the absence of Doctor Myers. When Doctor Akinbiyi examined Plaintiff and discovered that the left knee came out of the socket, Doctor Akinbiyi expressed his shock and amazement that this situation had gone unattended for 4 years." This paragraph provides admissible evidence (which is taken as true at the summary stage) that Dr. Akinbiyi examined Mr. Jervis in 2007 and Mr. Jervis's left knee felt as though it came out of the socket. Whether the knee actually came out of the socket is inadmissible speculation when offered by the non-expert Mr. Jervis, and what Dr. Akinbiyi said is inadmissible hearsay.

For the same reasons, the thirteenth paragraph is admissible to establish, for summary judgment purposes, that during 2008, Doctor Dennis Faulk, orthopedic surgeon at Wishard Hospital, examined Mr. Jervis's left knee and that Mr. Jervis's knee joint felt as though it had separated. What Dr. Faulk said

(according to Mr. Jervis, "that based upon all the tests that Plaintiff would need knee replacement surgery.") is inadmissible hearsay. Similarly, paragraph 14 is admissible to prove that Dr. Kraemer, orthopedic surgeon at Wishard Hospital, examined Mr. Jervis's left knee in 2008, and it might well be within Mr. Jervis's personal knowledge that "Doctor Kraemer prepared documents to schedule the knee replacement surgery." Dr. Kraemer's statement that Mr. Jervis didn't need an MRI on the left knee because he obviously needed knee replacement surgery is inadmissible hearsay.

The fifteenth paragraph contains inadmissible legal argument ("Any reasonable doctor would have surgically corrected the knee injury without delay in 2003 so that Plaintiff would have some chance to return to normal function. Instead, Doctor Mitcheff effectively confined Plaintiff to a wheelchair and denied Plaintiff any access to normal activity and exercise."), and information that might be within Mr. Jervis's personal knowledge, though the source of that knowledge isn't entirely clear ("Moreover, Doctor Mitcheff continually claimed that Plaintiff was faking his injuries and then repeatedly denied all written referrals to an orthopedic surgeon that had been prepared by Doctor Myers.").

Paragraph 16 begins with inadmissible legal argument: "Doctor Mitcheff has been deliberately indifferent to Plaintiff's continuous requests for access to qualified medical specialists for the proper diagnosis and treatment of Plaintiffs back and knee injuries." The paragraph goes on to effectively identify witnesses, but what they would testify to is either speculation or hearsay: "In the prison

hospital, Nurse Practitioner Diane Kaminsky and Nurse Michael Southern have both personally witnessed the fact of the broken left leg."

Mr. Jervis seems to offer paragraph 17 for rhetorical purposes: "Doctor Mitcheff has arrogantly refused to admit that he is not qualified to evaluate and treat orthopedic injuries, and has arrogantly refused to admit that the prison hospital does not have the necessary equipment to properly evaluate and treat serious back and knee injuries." Once the argumentative "arrogantly" is removed, this paragraph discloses only that Dr. Mitcheff hasn't said he is unqualified or unequipped. The eighteenth paragraph is completely argumentative, and provides nothing admissible under FED. R. CIV. P. 56(c)(1): "Doctor Mitcheff has deliberately engaged in numerous delay tactics, and has provided meaningless, superficial medical care that failed to address the cause of the continuous pain and suffering." The same is true of paragraph 19: "Doctor Mitcheff's so-called pain management program is meaningless since Doctor Mitcheff has refused to address the cause of the continuous pain — the physical injuries that could have been surgically corrected in 2003."

The twentieth paragraph contains admissible information within Mr. Jervis's personal knowledge: "Doctor Mitcheff has clearly stated that Plaintiff would never be taken outside the prison for professional medical care. Mitcheff has recently changed his position on this matter . . .." The last clause of that paragraph purports to explain Dr. Mitcheff's mental operation that led to the change of position ("due to the fact that four medical providers at the prison hospital have

witnessed the broken left leg."), but Dr. Mitchell's though processes aren't within Mr. Jervis's personal knowledge.

Paragraph 21 appears at first blush to be argumentative. Mr. Jervis argues that Dr. Mitcheff must not have looked at his medical records; had the doctor done so, he would have learned certain facts. Upon closer examination, everything Mr. Jervis says about his medical history is well within his personal knowledge, though he can do nothing more than speculate as to whether Dr. Mitcheff looked at the records. If a reasonable factfinder could infer from the record that Dr. Mitcheff didn't look at the records, the summary judgment court must draw the inference as well, but this point in the analysis focuses only on what is permissibly in the record. Thus, from paragraph 21, the following information is admissible: Mr. Jervis "suffered serious work-related injuries which resulted in a broken right leg, a collapsed lung, and injuries to the lower back. Plaintiff underwent lung surgery at St. Anthony Hospital in Michigan City, Indiana. For years thereafter, Plaintiff suffered severe pain from the lower back injury, until in 1999 Doctor Paul Madison ordered an MRI examination, which revealed a ruptured disc that was impacting the sciatic nerve. Back surgery in 1999 relieved some of the distress and debilitating pain."

On the same reasoning, ¶ 25 of Mr. Jervis's affidavit sets forth more of his medical history: "Even though Plaintiff might suffer from arthritis in his lower spine and knee, that pain is nothing compared to the continuous debilitating pain from a broken left leg and an impacted disc in the upper back. Further, Mitcheff

failed to request and review prior medical records of Plaintiff from Michigan City medical providers, and thus failed to learn that Plaintiff had been seriously injured at his workplace, suffering a broken right leg, a collapsed lung, and lower back injuries when a 1400 pound tractor tire fell on Plaintiff." Again, whether Dr. Mitcheff requested or reviewed those prior records is what Mr. Jervis infers and contends, but isn't within his personal knowledge.

None of ¶ 22 is admissible for summary judgment purposes. The first sentence is too conclusory to be meaningful ("Doctor Mitcheff has continually denied the fact of the broken left leg and the upper back injury, and has continually denied access to medical specialists."), and the second sentence is hearsay ("On January 9, 2009, orthopedic surgeon Doctor.Kraemerat Wishard Hospital in Indianapolis informed Plaintiff that an MRI on the left knee was unnecessary because the X-Ray clearly indicated that Plaintiff needed knee replacement surgery, and that Kraemer would issue the medical documents requesting the knee replacement surgery.").

The first clause of ¶ 23, in which Mr. Jervis says state prison and Department of Correction officials have allowed him to linger with continuous severe pain for five years, is admissible to the extent he says he has been in continuous severe pain for five years, but argumentative and too conclusory to be meaningful when he says officials have allowed it. The final clause of ¶ 23, in which he says he has been "without any access to professional medical care for 5 years," would be within Mr. Jervis's personal knowledge.

Paragraph 24 is pure speculation. Mr. Jervis says he needs an orthopedic surgeon to repair his broken leg so he can get out of his wheelchair and start walking normally again, but Mr. Jervis has no medical training on which to base such an opinion. He says he's been denied important and necessary exercise in order to maintain some semblance of good health, but again, the extent of exercise necessary for one of his age and in his condition is a matter of medical opinion. He says he was denied exercise (and an orthopedic surgeon) because of the monetary concerns of CMS and Doctor Mitcheff, but Mr. Jervis has no personal knowledge of those thought processes.

The affidavit's twenty-sixth through twenty-ninth paragraphs are entirely within Mr. Jervis's personal knowledge, and so are admissible for summary judgment purposes:

> 26. Plaintiff suffered for many years from the debilitating pain in his back, eventually resulting in the Social Security Administration declaration that Plaintiff was permanently disabled. During 1999, Doctor Paul Madison ordered an MRI examination, which revealed a ruptured disc that was impacting the sciatic nerve. Back surgery in 1999 relieved some of the distress and debilitating pain.
> 27. Doctor Mitcheff claimed that any MRI test was not medically necessary because Plaintiff was faking his injuries in order to get drugs.
> 28. Plaintiff suffered a fracture to his right leg as a result of a work-related injury. Plaintiff had no prior injuries to his left leg before 2003.
> 29. Doctor Mitcheff has recently informed Plaintiff that surgery was too great a risk for Plaintiff, and that Plaintiff should walk as much as possible.

The thirtieth paragraph provides inadmissible opinion ("Plaintiff observed that Doctor Mitcheff enjoyed inflicting pain when . . .") as well as mostly

admissible personal knowledge (Dr. Mitcheff "inserted a very large needle into the left knee, without any pain medication, and then pulled out damaged cartilage and excess fluid."), but the paragraph's admissible portion duplicates the admissible portion of ¶ 8.

Most of ¶ 31 is admissible: "Plaintiff has maintained daily records which clearly indicate that Plaintiff was out of his prescribed medications for weeks at a time. Plaintiff has filed numerous letters and grievances regarding the lack of proper medication." The only inadmissible portion is that the records "clearly indicate" the second fact set forth (that Mr. Jervis was out of his meds for weeks at a time). If the records are to speak at all, they must speak for themselves.

Most of ¶ 32 is inadmissible hearsay, at least in the absence of the papers to which the affidavit refers. Mr. Jervis may testify that he received "numerous responses from prison staff," but unless he can show either that the responders were agents of Dr. Mitcheff, *see* FED. R. EVID. 801(d)(2)(D), or an applicable hearsay exception, Mr. Jervis can't testify to what the responders said to prove the truth of what the responders said. *See* FED. R. EVID. 801(c); *see, e.g.,* Schindler v. Seiler, 474 F.3d 1008, 1011 (7th Cir. 2007). For the same reasons, ¶ 33 ("Plaintiff was informed by prison hospital staff that Doctor Mitcheff instituted a program which allowed inmates to have pain medication for only 10 days out of each month.") is completely inadmissible as hearsay.

The first two sentences of ¶ 34 ("Plaintiff was informed by prison hospital staff that Doctor Mitcheff instituted a program which allowed inmates to have pain

medication for only 10 days out of each month. This fact is a matter of record, which can be attested to by numerous inmates and staff at the prison.") are hearsay and inadmissible. The last sentence duplicates the admissible portion of ¶ 31.

None of ¶ 35 is admissible. The first sentence ("Doctor Mitcheff has continually abused and insulted Plaintiff with his comments and with his continual allegations that Plaintiff is faking or exaggerating his injuries.") is argument. The second sentence ("Furthermore, Doctor Mitcheff has informed other inmates in the prison hospital 'Tell Jervis hello for me.') is hearsay — not Dr. Mitcheff's statement to the other inmates, but the other inmates's retelling of the statement to Mr. Jervis. *See* FED. R. EVID. 805; *see* United States v. Hajda, 135 F.3d 439, 444 (7th Cir. 1998). The last sentence ("This is a clear reflection on the character of Doctor Mitcheff.") is an attempt to prove, through conduct on one occasion, a person's character in order to prove his conduct on another occasion — which the rules of evidence forbid. *See* FED. R. EVID. 404(b); *see, e.g.,* United States v. Hensley, 574 F.3d 384, 388-389 (7th Cir. 2009).

Mr. Jervis's affidavit, then, asserts that after he hurt his back on August 2, 2003, no medical doctor professionally examined him for two years. He swears that Dr. Metcalf saw him on September 2, 2003, stuck in needle in his knee and caused excruciating pain, accused Mr. Jervis of faking his injuries, promised that Mr. Jervis would never receive any pain medication, and caused Mr. Jervis to be confined for six months in a hospital segregation ward in which Mr. Jervis never

received any medical treatment or pain medication. Mr. Jervis swears that he has been in constant excruciating pain since his fall, and that he has been without access to professional medical care for five years.

The facts set forth in Mr. Jervis is affidavit would, if true, amount to a blatant violation of the United States Constitution. The states must provide medical care to their inmates. <u>Estelle v. Gamble</u>, 429 U.S. 97, 103 (1976). In the context of medical care cases, the test is whether the defendant was deliberately indifferent to the serious medical needs of a prisoner. <u>Gutierrez v. Peters</u>, 111 F.3d 1364, 1369 (7th Cir. 1997). A violation of the Eighth Amendment's cruel and unusual punishments clause consists of two elements: (1) objectively, whether the injury is sufficiently serious to deprive the prisoner of the minimal civilized measure of life's necessities, and (2) subjectively, whether the prison official's actual state of mind was one of "deliberate indifference" to the deprivation. <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994).

To satisfy the objective component, a prisoner must demonstrate that his medical condition is "objectively, sufficiently serious." <u>Farmer v. Brennan</u>, 511 U.S. at 834 (internal quotations omitted). A serious medical condition is one that a physician has diagnosed as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention. <u>See Foelker v. Outagamie County</u>, 394 F.3d 510, 512–513 (7th Cir. 2005). To satisfy the subjective component, a prisoner must demonstrate that prison officials acted with a "'sufficiently culpable state of mind.'" <u>Farmer v. Brennan</u>, 511 U.S. at 834

15

(quoting Wilson v. Seiter, 501 U.S. 294, 297 (1991)).

> [C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, *i.e.,* the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so.

Board v. Farnham, 394 F.3d 469, 478 (7th Cir. 2005) (quotation marks, brackets, and citation omitted). "Negligence on the part of an official does not violate the Constitution, and it is not enough that he or she should have known of a risk. Instead, deliberate indifference requires evidence that an official actually knew of a substantial risk of serious harm and consciously disregarded it nonetheless." Pierson v. Hartley, 391 F.3d 898, 902 (7th Cir. 2004) (citations omitted). A trier of fact can conclude that the defendant was aware of the risk if the danger was objectively so great that actual knowledge of the danger could be inferred. Walker v. Benjamin, 293 F.3d at 1037 (citing Farmer v. Brennan, 511 U.S. at 842). Deliberate indifference is "something approaching a total unconcern for [the plaintiff's] welfare in the face of serious risks, or a conscious, culpable refusal to prevent harm." Duane v. Lane, 959 F.2d 673, 677 (7th Cir. 1992). It isn't enough to show that a defendant merely failed to act reasonably. Gibbs v. Franklin, 49 F.3d 1206, 1208 (7th Cir. 1995). Even medical malpractice and incompetence do not state a claim of deliberate indifference. Walker v. Peters, 233 F.3d 494 (7th Cir. 2000).

These allegations ordinarily would be far more than was necessary to defeat a summary judgment motion. Summary judgment isn't a procedure for deciding

the true facts of a case. Instead, a summary judgment motion tests whether the evidence is such as to require a trial. Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Rule 56(c) further requires the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A court's role isn't to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–250 (1986); Doe v. R.R. Donnelley & Sons Co., 42 F.3d 439, 443 (7th Cir. 1994). The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. Celotex v. Catrett, 477 U.S. at 323. The nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing a genuine issue for trial. Id. at 324. "Factual disputes are 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the [non-movant].'" Oest v. Illinois Dep't of Corrections, 240 F.3d 605, 610 (7th Cir.2001) (quoting Anderson v. Liberty Lobby, 477 U.S. at 247). A "material fact" is one that "might affect the outcome of the suit." Anderson v. Liberty Lobby, 477

U.S. at 248. A dispute is genuine only if a reasonable jury could find for the non-moving party. Id. The court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. at 248.

Although a bare contention that an issue of fact exists doesn't create a factual dispute, the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. See Bellaver v. Quanex Corp., 200 F.3d 485, 492 (7th Cir. 2000).

For all these reasons, a summary judgment court ordinarily must take as true what the nonmovant claims and supports with admissible evidence, and view the rest of the evidence in the light most favorable to the nonmovant. To the extent Dr. Mitcheff's affidavit denies what Mr. Jervis says, then, it points to trial, not the granting of summary judgment to Dr. Mitcheff. But it isn't only Dr. Mitcheff's affidavit that contradicts Mr. Jervis's sworn statements; so do Mr. Jervis's medical records as maintained by the prison.

According to those records, Mr. Jervis was sent to St. Anthony's Hospital in Michigan City, Indiana on the very day he fell. He received stitches and a thorough examination while there. The medical records indicate that Dr. Mitcheff later received and reviewed x-rays of Mr. Jervis's shoulders, spine, and left knee. The radiology report on the knee showed a possible old fracture and resulting degenerative joint changes, but no new fracture. The records indicate that Dr. Mitcheff examined Mr. Jervis after his fall down the stairs (according to the

medical records, the examination occurred on November 6, 2003). Mr. Jervis initially declined to get out of his wheelchair for the examination. The records indicate that Dr. Mitcheff prescribed pain medication and concluded that surgery was too risky because of Mr. Jervis's other ailments and medications (which are discussed shortly), declined Mr. Jervis's request for an MRI because an MRI wasn't medically necessary, and encouraged Mr. Jervis to walk as much as possible.

According to the medical records, it was on January 21, 2004 that Dr. Mitcheff first injected a steroid (or anything else) into Mr. Jervis's left knee (Dr. Mitcheff says he used an anesthetic). Other injections followed. The records indicate at Dr. Mitcheff prescribed Vicodin for Mr. Jervis's pain. The records indicate that pain medication like Vicodin and Tylenol were often prescribed for Mr. Jervis since his fall, and that Mr. Jervis could get Tylenol for the commissary for his arthritis pain.

The medical records indicate that Mr. Jervis suffered from many medical conditions before he fell down the stairs, including protein S deficiency, diabetes, gout, hypertension, and obesity. Before being imprisoned, Mr. Jervis was identified as having mental health issues including depression and bipolar disorder. The records indicate that Mr. Jervis sometimes refuses to comply with his treatment plan and doesn't follow advice of medical staff. The records indicate that Mr. Jervis often is argumentative and abusive to staff. Mr. Jervis suffers from arthritis in his lower spine and knee, and doctors (including Dr. Mitchell) have

encouraged Mr. Jervis to lose weight and walk more, which would improve his health, his chronic arthritis pain, and his diabetes. The records indicate that Mr. Jervis doesn't always follow that advice. The medical records indicate as well that Mr. Gervis wears a port-a-cath that is no longer medically necessary, and he refuses to allow medical staff to remove it.

The medical records indicate that Mr. Jervis was prescribed Vicodin almost immediately after his fall, and was still being prescribed Vicodin off and on as late as January, five months after his fall. The records contain a March 7, 2006 letter from Mr. Jervis complaining that he had been locked up on D-East for more than two years; an entry about two weeks after his fall reports that Mr. Jervis had recently been transferred to D-East for a six-month disciplinary sentence for attacking another person. The records indicate that Dr. Mitcheff sent Mr. Jervis to St. Anthony's Hospital again about three weeks after his injury. The records indicate that Mr. Jervis refused to come to sick call more than once.

Medical records may be imperfect history. Incorrect entries can occur despite every good faith effort to prevent them. But for Mr. Jervis's account to be true, the errors in his medical records must be calamitous, or even conspiratorial. The conflict between Mr. Jervis's affidavit and his medical records is irreconcilable. Mr. Jervis's records appear to have been made by a variety of health care providers, all of whom would have to have been mistaken, incompetent, or corrupt for Mr. Jervis's narration of his medical treatment — that he was denied medical care for five years — to be credited.

It might be possible that ten or more members of the prison medical staff decided to report medical treatment in Mr. Jervis's records while withholding the reported treatment, and to do so for years, but the only evidence of such a conspiracy is Mr. Jervis's statements that he received no medical treatment or pain medication whatsoever. Those statements provide exceedingly weak evidence of a conspiracy within the medical staff. It would seem more likely at some other inmate named Jack Jervis has been receiving the medical care that Mr. Jervis should have received—another extremely unlikely possibility. The third possibility is that Mr. Jervis's narrative is wrong, either innocently or otherwise.

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). The ultimate test for summary judgment is whether any reasonable trier of fact could find in the plaintiff's favor, so the court may only view the summary judgment record as favorably to the plaintiff as the record reasonably will allow. Mr. Jervis's problem isn't his affidavit's adequacy to outline a set of facts that would entitle him to relief; it is that on this summary judgment record, no reasonable trier of fact could find those facts to exist. The most generous light that can be placed on this record is that Mr. Jervis is innocently mistaken about what happened to him.

Scott v. Harris, 550 U.S. 372, was an excessive force claim brought against police officers under 42 U.S.C. § 1983 based on a high speed vehicular chase. The

plaintiff swore in his affidavit that he wasn't driving in a way that would endanger human life, that he had full control of his vehicle, that he slowed for turns and intersections and usually signaled his turns, and that he didn't run any motorists off the road. Id. at 379. The pursuing police car, however, was equipped with a video camera that recorded the chase, and the videotape was part of the summary judgment record. The plaintiff didn't argue that the videotape had been doctored or altered. The Supreme Court reviewed the videotape and concluded that, "Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him." Id. at 380.

So, too, here: the medical records so utterly discredit Mr. Jervis's version of the events that no reasonable jury could believe his account. Since no reasonable jury could find in Mr. Jervis's favor, the court GRANTS the defendant's motion for summary judgment (doc. #70). The clerk shall enter judgment accordingly.

ENTERED:  October 23, 2009

        /s/ Robert L. Miller, Jr.
        Chief Judge
        United States District Court

cc: J. Jervis
    A. Overholt